IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DIANA BOOTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:15-cv-00410-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Plaintiff Diana Booth appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits. Having considered the record and the written briefing, and heard the parties' oral argument [Doc. 14], the Court orders the decision reversed. The case is remanded for a new hearing and further proceedings consistent with this Order.

**I.    Background**

The relevant alleged disability period for purposes of the present appeal is November 11, 2011, Booth's date of alleged onset, through December 23, 2013, the date of the ALJ's decision.

Booth was born in 1973. From the mid-1990's until about 2003, she worked as a real estate agent. From about 2004 to 2006, she worked as a server. In 2006, she provided home health care. She also started nursing school, and obtained her degree in 2009. Starting September 2009, she worked in rehabilitation and senior living centers in positions including staff development coordinator, on-call nurse supervisor, charge nurse, infection control nurse, and restorative aide, until she stopped working in November 2011.

### A. Medical history

In June 2005, Booth saw her psychiatrist, Dr. Subbu Sarma, reporting that she was having panic attacks a couple of times a week, experiencing depression, and having anxiety related to eating. Dr. Sarma diagnosed panic disorder, changed Booth's dose of Zoloft, and prescribed Xanax. The next month, Booth reported some improvement, but that she was also experiencing some irritability and insomnia. In August 2005, Booth reported sleeping fairly well, but that she was still having one or two panic attacks a week. In October 2005, Booth told Dr. Sarma that she was more depressed, irritable, and anxious, and sometimes slept poorly. The doctor prescribed Geodon. Booth continued to have panic attacks and in November 2005, Dr. Sarma prescribed Seroquel. In January 2006, Dr. Sarma noted Booth's mood was stable.

Booth saw Dr. Sarma in August 2010. She reported that she continued to experience insomnia, anxiety, and restless leg syndrome, and that Effexor and Klonopin were not helping. Dr. Sarma diagnosed major depressive disorder and generalized anxiety disorder, and increased Booth's dose of Effexor. In October 2010, Booth reported having problems with libido and that she had cut back on the Effexor. Dr. Sarma diagnosed major depressive disorder, restless leg syndrome, and insomnia, and prescribed Remeron. In February 2011, Booth reported anxiety and depression, and that trials of different medications had not helped her insomnia. Dr. Sarma diagnosed Booth with primary insomnia, major depressive disorder, restless leg syndrome, and rule-out bipolar disorder. He prescribed a trial of Lexapro for anxiety and depression, Ambien for sleep, Klonopin and Xanax for anxiety, and Risperdal to stabilize mood.

In February 2011, Booth fell over a wheelchair at work, hitting her head, right leg, and elbow. She saw Dr. Kenneth Reynolds, reporting pain in her knee and lower back that was made worse with moving and walking, head pain, and chronic pain in her neck and back.

Dr. Reynolds diagnosed right knee and head contusions, and gave Booth restrictions for work. About a week later, Booth told Dr. Reynolds that she was doing fine, and Dr. Reynolds released her to return to regular work duty.

Booth saw Dr. Sarma on February 14, 2011. She reported continued anxiety, panic, sleep disturbance, depression, irritability, and tearfulness. Dr. Sarma gave a rule-out diagnosis of bipolar disorder and started Booth on Risperdal and Lexapro.

Booth saw Dr. Christine Moore, a primary care physician, in January and February 2011, complaining of difficulty with memory and concentration, problems with sleep, muscle pain in her back and neck, headaches, fatigue, irritable bowel, sore throat, problems with dizziness and balance, and depression. Dr. Moore's impression was back pain, chronic fatigue, and insomnia. She prescribed Savella and referred Booth for a rheumatology consultation and sleep study.

Booth saw Dr. Veronica Anwuri, another primary care physician, in March 2011 with complaints of excessive fatigue that had increased over several months and was interfering with work, and continued back pain. Dr. Anwuri's assessment was fibromyalgia and chronic fatigue syndrome. Booth told the doctor that she wanted to pursue treatment of the fibromyalgia and chronic fatigue syndrome before addressing her back issues, and that she wanted to avoid pain pills. The doctor prescribed a stimulant, pain patches, and an anti-inflammatory, and referred Booth to a sleep specialist regarding the fatigue.

Dr. Scott Eveloff, a sleep specialist, evaluated Booth in April 2011. Booth reported longstanding daytime fatigue and sleepiness, reduced daytime cognition, and difficulty sleeping. Booth said she had some improvement of her symptoms with Adderall, but not enough to reduce her overwhelming fatigue throughout the day. In connection with the evaluation, Dr. Eveloff spoke with Booth's psychiatrist, Dr. Gayed, who said Booth had had "extremely long-standing

and complicated psychiatric and sleep issues for years and has been treated with a multiplicity of medications." [Tr. 340.] Dr. Eveloff assessed persistent disorder of initiating or maintaining sleep, idiopathic hypersomnia without long sleep time, restless legs syndrome, and anxiety disorder. He advised Booth to reduce her use of benzodiazepines, work on her sleep, and consider a stimulant like Nuvigil.

The same month, Booth saw Dr. Stephen Ruhlmann, a rheumatologist. Dr. Ruhlmann noted Booth had 15 of 18 fibromyalgia tender points on exam. He also noted that Booth could have chronic fatigue syndrome. He advised her to decrease her anxiety medications because they can be sedating, if she could keep her generalized anxiety disorder under control.

On July 2, 2011, Booth went to the emergency room for back pain. The attending physician's impression was herniated disc. Booth was prescribed Flexeril and prednisone.

On July 11, 2011, Booth saw a neurosurgeon, Dr. Geoffrey Blatt, reporting left-side low back pain that radiated to her hips and caused numbness and tingling in her legs if she sat for too long. Dr. Blatt noted decreased range of motion and report of left-side and hip pain with all movements on exam. The doctor recommended physical therapy if the pain persisted and said he would not recommend more aggressive intervention at that time.

Booth began seeing Dr. Joseph Galate, Metro Spine & Rehab, in October 2011 for treatment of her back pain. Dr. Galate also recommended physical therapy, and advised that it was not in Booth's best interest to continue taking narcotics. Later that month, there was no change in Booth's condition. She continued to report aching pain in her buttocks that radiated to her feet, and Dr. Galate prescribed Relafen.

Later the same month, Booth saw Dr. Mark Box, a primary care physician, with complaints that her pain was worsening and she was having problems with headaches, and that

4

her fatigue was interfering with day-to-day functions. Dr. Box performed a physical examination. He noted Booth had classic fibromyalgia tender points on exam, and his assessment was fibromyalgia and chronic fatigue syndrome. He increased Booth's dose of Adderall.

In November 2011, Booth told Dr. Galate she was experiencing increased low back pain following physical therapy. Dr. Galate started Booth on Zanaflex and gave her Lidoderm patches. In December 2011, Booth reported continuing back pain. Dr. Galate noted that Booth's physical therapist felt further treatment would not be beneficial due to minimal objective progress and decreased strength.

In January 2012, Booth told Dr. Box she had lost her job and insurance, and was having difficulty affording her medications. Dr. Box performed a physical examination, and his assessment was fibromyalgia and chronic fatigue. He encouraged Booth to try to continue with the medications she was on.

Booth saw Dr. Adrian Jackson, Premier Spine Care, in January 2012 for a surgical opinion at the request of Dr. Galate. Booth reported that her back pain had gradually worsened. On exam, Dr. Jackson noted diminished touch sensation below Booth's knees and tenderness to palpation at the lumbosacral junction. The doctor's impression was of a bulging disc, but she did not think surgical treatment was appropriate. Dr. Jackson noted that with Booth's medical history and chronic fatigue, Booth had been extremely inactive. She advised Booth to be more physically active and to follow up with Dr. Galate. [Tr. 403.]

In March 2012, Dr. Galate noted that a functional capacity evaluation showed Booth was capable of heavy work, although the evaluation also showed invalid effort. The doctor opined that Booth was at maximum medical improvement at that time.

5

Later the same month, Booth saw Dr. Box. She told him that she continued to have difficulty getting her medications and her psychiatrist would no longer see her because she had no insurance. She said she could barely function because of her fatigue and inability to obtain her stimulant medication, and she reported a moderate level of pain. On exam, Dr. Box noted Booth had classic fibromyalgia tender points. He noted that "[h]opefully [Booth] can get some coverage for Provigil soon" because it might be the "optimal therapy" for her. [Tr. 509.] Dr. Box advised Booth to decrease her benzodiazepines, which her psychiatrist had prescribed, and "encouraged her to try to increase her level of exercise." [*Id*.] Booth continued to complain in August and September 2012 of fatigue, generalized body aches and pains, and anxiety symptoms.

In October 2012, Booth told Dr. Box she was having periods of sleeping for two to three days at a time. Dr. Box noted her symptoms suggested narcolepsy. Booth said she could not afford Adderall, which had been helpful. Dr. Box advised Booth to try taking Nuvigil again.

Booth saw Dr. Box in May 2013, reporting ongoing problems with generalized pain and fatigue, difficulty sleeping, low mood, and crying spells. She was taking stimulants, Adderall and Nuvigil, which helped her fatigue symptoms, but still had to take a nap during the day and had a disruptive, restless sleep pattern at night, notwithstanding use of clonazepam and Ambien for rest. She felt that her bupropion made her light-headed and sometimes caused confusion. She reported that she had difficulty managing at home, and doing activities of daily living. Dr. Box's assessment was fibromyalgia. He noted that Booth "continues to have a lot of symptoms[,]" but did not think that a change in her regimen would result in significant improvement. [Tr. 590.] His plan was to taper her off of the bupropion, but continue with the stimulants, Lexapro, clonazepam, and Ambien. He encouraged Booth to "try to keep up with

6

some regular stretching and gentle exercise." [*Id.*]

Booth followed up with Dr. Box in July 2013. She reported that her increased dosage of Lexapro helped some, and that she still had a moderate amount of pain and some depressive symptoms, but her mood and energy were better. Dr. Box's assessments were fibromyalgia and chronic fatigue. She was directed to continue with her current regimen of medications, including Lexapro, Nuvigil, clonazepam, and Xanax. Dr. Box also encouraged Booth to try to keep up with regular exercise.

**B.    Booth's testimony**

Booth testified at the hearing held on October 17, 2013. She said that in 2011, she started leaving work early because she was too tired to complete the work day. She has insomnia and chronic fatigue, but also has difficulty waking up. Alarms and a ringing phone may not rouse her. She was late to the hearing because she could not wake up.

Booth's four children were ages 19, 12, 8, and 4 at the time of the hearing. She explained that at one time, both of her youngest children, as well as her brother-in-law, had been living with her, and her brother-in-law helped with childcare. Her brother-in-law moved out. When she was not able to get her 8-year-old to school on time consistently, he had had to go live with his father. Her four-year old goes part-time to a learning center and her husband works an overnight shift. To take care of her youngest son herself, Booth at times has had to lock him in her bedroom with him, with snacks and drinks and movies for him to watch, so that if she dozed off he could not get out. When Booth has a flare-up of symptoms, her husband stays home to take care of the four-year-old. She avoided taking pain medication or muscle relaxers during the day so that she would not fall asleep when watching her son. She can sit outside in a chair for an hour or two, watching her son play.

7

Booth said she typically spent her days lying on the couch or in her room. Performing physical therapy exercises is painful. On Dr. Box's recommendation, she uses a cane. Someone gave her an electric wheelchair, which Dr. Box encouraged her to use to get out and around. Booth uses the wheelchair whenever she does anything that would require a lot of walking, such as going to the park with her children or to the grocery store. Her husband does almost all of the household chores. Depending on what kind of day she is having, she can put laundry on hangers or fold it, or start loads of laundry. She sometimes does a few dishes, but it hurts her back. She will go outside and sit on the curb when the dog needs to go out. She spends some time on the computer.

Booth said she had many side effects from her medications including sedation, dizziness, impaired memory, nausea, stomach pain, constipation, diarrhea, ringing in her ears, dry mouth, numbness and tingling in her fingers, and appetite suppression. She also had difficulty concentrating and remembering things. Her normal weight was 125 pounds, but she weighs 108 pounds due to medications making her nauseous or suppressing her appetite, and causing her to forget to eat.

**C.**    **Expert reports**

Dr. Box, one of Booth's primary care physicians, completed a medical source statement on December 6, 2012. He opined that Booth could sit for four hours total, and stand and walk for one hour total. The doctor also opined that Booth needed to alternate between sitting and standing; could grasp, push or pull, and perform fine manipulation with objects between five and ten pounds for up to 30 minutes; and could operate foot controls for 30 minutes at a time. The doctor further opined that Booth could occasionally lift 20 pounds; occasionally climb, balance, and reach above shoulder level; and never stoop, kneel, crouch, or crawl. Dr. Box opined that

Booth had severe restrictions with respect to exposure to marked changes in temperature or humidity; moderate restrictions to unprotected heights, being around moving machinery, or driving automotive equipment; and mild restrictions in exposure to dust, fumes, and gases. He further opined that Booth suffered from disabling pain and fatigue that precluded attention and concentration for even simple, unskilled work tasks. With respect to fibromyalgia and chronic fatigue, Dr. Box noted that Booth had a history of widespread pain, consistently exhibited pain on palpation in at least 11 of the 18 tender point sites, suffered from stiffness and also had fatigue of sufficient severity to preclude work. [Tr. 571-75.] The ALJ gave Dr. Box's opinion little weight. [Tr. 26.]

Dr. Mary McNaughton, a non-examining State-agency doctor, reviewed Booth's records. Dr. McNaughton opined in June 2012 that Booth could lift 20 pounds occasionally and up to 10 pounds frequently; sit for up to six hours in an eight-hour workday; and stand or walk for up to six hours in an eight-hour workday. She also opined that Booth should avoid concentrated exposure to vibration and hazards. [Tr. 71-72.] The ALJ gave Dr. McNaughton's opinion great weight. [Tr.25]

The ALJ asked the vocational expert about a hypothetical individual with the following limitations: sit six of eight hours; stand and walk six of eight hours; should have the ability to shift from sitting to standing; is able to lift, carry, push, or pull 10 pounds frequently and up to 20 pounds occasionally; none of these activities should be performed overhead with the left upper extremity; should never climb ladders, ropes, and scaffolding; occasionally climb stairs or ramps, stoop, kneel, crouch, and crawl; frequently flex the left elbow, as opposed to constantly; never reach overhead with left upper extremity; avoid extreme cold and vibration; should never be exposed to hazards, such as dangerous machinery or unprotected heights; should never be

9

expected to understand, remember, or carry out detailed instructions; job duties must be simple, repetitive and routine; should never be expected to exercise independent judgment regarding the nature of her job duties. The VE testified that such an individual could not perform Booth's past relevant work but could perform work as a cashier, retail marker, or collator operator.

The ALJ then proposed a second hypothetical individual the same limitations as the first, but with the following additional limitations: sedentary exertion; lift, carry, push, or pull negligible weights, such as files or documents, up to five pounds frequently and 10 pounds occasionally; able to sit for six of eight hours; stand or walk for two of eight hours; must have the capability to shift positions. The VE testified that an individual with these limitations could work as an administrative support worker, printed circuit board inspector, or an optical goods lens inserter. But the VE further testified that if the hypothetical individuals missed two to three days of work a month, then no jobs would be available, and if they arrived an hour late to work once a week, then they would not be able to sustain employment.

Booth's attorney proposed a hypothetical individual with the following limitations: able to sit four of eight hours a day; stand and walk a total of one hour; needs to be able to alternate between sitting and standing; occasionally lift up to 20 pounds; occasionally climb and balance; never stoop, kneel, crouch, or crawl. The VE testified that an individual with these limitations would not be able to perform any jobs.

### D.  The ALJ's Decision

The ALJ found that during the relevant period, Booth had severe impairments of degenerative disc disease; fibromyalgia; mild impingement of the left shoulder; mild epicondylitis of the left elbow; and major depressive disorder. Booth did not claim to meet any Listings, and the ALJ did not find that she met any. The ALJ found Booth's allegations were not

10

Case 4:15-cv-00410-NKL   Document 15   Filed 02/17/16   Page 10 of 18

entirely credible.

      The ALJ found Booth has the residual functional capacity to perform:

> [L]ight work as defined in 20 CFR § 404.1567(b). Specifically, [Booth] is able to sit for 6 hours out of 8 hours, and she can stand and walk in combination for 6 hours out of 8 hours. She must have the ability to shift. [Booth] can lift, carry, push, or pull 10 pounds frequently and up to 20 pounds occasionally. None of these activities should be performed overhead with her left upper extremity. [Booth] can never climb ladders, ropes, or scaffolding. She can occasionally climb stairs or ramps; stoop; kneel; crouch; and crawl. She is able to frequently flex her left upper extremity (as opposed to constantly) but never reach over-head. [Booth] can never be exposed to extreme cold or to vibration. She can never be exposed to hazards, such as dangerous machinery and unprotected heights.
>
> Mentally, [Booth] should never be expected to understand, remember, or carry out detailed instructions. Her job duties must be simple, repetitive, and routine in nature. …

[Tr. 21.]

The ALJ determined Booth is not capable of performing past relevant work, but is capable of performing other jobs that exist in significant numbers in the local and national economy, such as cashier, retail marker, and collator operator.

## II. Discussion

Booth challenges the RFC finding, arguing that the ALJ should have relied on the opinion of her treating physician rather than that of a non-examining consultant, and should have addressed Booth's chronic fatigue syndrome. She further argues that at Step 5, the VE should have been asked to identify, and provide a reasonable explanation for, inconsistencies between the VE's expert testimony and the Dictionary of Occupational Titles. Therefore, Booth argues, the RFC and Step 5 findings are not supported by substantial evidence on the record as a whole. She asks that the decision be reversed, and the case remanded for a new hearing.

11

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A.     Formulation of the RFC

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

With respect to the weight given medical source opinions, an ALJ must give controlling weight to a treating medical source opinion if it is well-supported by medically acceptable

clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 786 F.3d 1126, 1132 (8th Cir. 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir. 2007)). The opinion may be given "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id*. (citations omitted). And the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (*quoting Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)).

### 1. Medical opinion evidence

Here, the ALJ gave the opinion of Dr. Box, a treating medical source, little weight. Dr. Box's opinion included limitations of sitting for four hours total, and standing and walking for one hour total. He noted Booth had a history of widespread, consistent pain and stiffness, and that she suffered fatigue of sufficient severity to preclude work. The ALJ concluded Dr. Box's opinion was unsupported because it was inconsistent with treatment notes indicating he encouraged Booth to increase physical activity, and because of gaps in Booth's treatment. Substantial evidence on the whole record does not support the ALJ's conclusion.

Dr. Box's recommendation concerning physical activity is consistent with his opinion. Dr. Box encouraged Booth to "try to keep up with some regular stretching and gentle exercise." [Tr. 590.] A neurosurgeon and back specialists who saw Booth similarly recommended physical therapy or encouraged physical activity to address Booth's pain issues. Encouragement to engage in physical activity does not mean Booth does not have disabling pain and fatigue, nor that physical activity will entirely ameliorate the conditions, and neither Dr. Box nor any of Booth's other treatment providers has ever so opined. *See Forehand v. Barnhart,* 364 F.3d 984,

13

988 (8th Cir. 2004) (acknowledging that in the context of fibromyalgia cases, the ability to engage in some physical activities is not substantial evidence that a claimant can perform substantial gainful activity); *Brosnahan v. Barnhart,* 336 F.3d 671, 678 n.1 (8th Cir. 2003) (physical activity is a recognized treatment for fibromyalgia, a condition that can cause pain and chronic fatigue). Booth consistently complained of pain to Dr. Box, who consistently observed that Booth displayed fibromyalgia trigger points on physical examination. The ALJ in fact included fibromyalgia as a severe impairment at Step 2. Booth's medical record also shows that for years she has consistently complained of sleep problems and fatigue to, and has been diagnosed with insomnia and treated for chronic fatigue by, a number of doctors including Drs. Sarma, Moore, Anwuri, Gayed, and Eveloff, as well as Dr. Box. In 2011, for example, Dr. Gayed, Booth's psychiatrist, told Dr. Eveloff, a sleep specialist who was evaluating Booth, that Booth had had "extremely long-standing and complicated psychiatric and sleep issues for years and has been treated with a multiplicity of medications." [Tr. 340.]

Whether Booth's fibromyalgia symptoms wax and wane, as the ALJ concluded, does not mean Booth is capable of performing substantial gainful activity day in and day out, *Forehand,* 364 F.3d at 988, nor that she does not have disabling fatigue. *See also McCoy v. Astrue,* 648 F.3d 605, 617 (8th Cir. 2011) (RFC determination must be based on the claimant's ability to perform the necessary physical activities day in and day out). And at the May 2013 visit in which Dr. Box recommended that Booth try to keep up with regular stretching and engage in gentle exercise, Dr. Box also noted that a change in Booth's regimen was unlikely to result in significant improvement.

Dr. Box's recommendation concerning stretching and gentle exercise is consistent with his own treatment notes, as well as records of treatment provided by other physicians.

14

Case 4:15-cv-00410-NKL   Document 15   Filed 02/17/16   Page 14 of 18

The ALJ also discounted Dr. Box's opinion based on what the ALJ described as gaps in treatment. At the time Dr. Box gave his December 2012 opinion, he had last seen Booth in October 2012, or two months prior. The longest gap between visits prior to that visit was three months, October 2011 to January 2012. At every visit Booth had with Dr. Box, the doctor consistently noted Booth's complaints of pain or insomnia; performed physical examinations; and diagnosed fibromyalgia, chronic fatigue, or both. Dr. Box never noted or opined that Booth had been free of all pain and fatigue between visits. As recently as her visit with Dr. Box in May 2013, when the doctor saw Booth after a several-month gap, the doctor opined that she "continues to have a lot of symptoms[,]" and that a change in her regimen would not result in significant improvement. [Tr. 590.] Gaps between visits with Dr. Box do not demonstrate that the doctor's opinion lacks support.

The ALJ also concluded that other parts of the record were inconsistent with Dr. Box's opinion, but picked and chose from the record, and did not provide good reasons for that conclusion. For example, the ALJ stated that in February 2011, Booth reported feeling well after a fall at work and that she was released to full duty. But whether Booth had recovered from her fall at that time does not mean she was not disabled at the alleged onset date of November 2011. The ALJ notes Booth "went without pain medications for many months in 2012" or "at times in 2013" [Tr. 23], but fails to note that in 2012 Booth lost her insurance and could not afford some medications for a period of time, and that she avoids taking pain medication when she has to care for her small child. The ALJ notes that Booth "was advised by Joseph Galate, M.D. to wean from medications in March 2012[.]" [Tr. 23.] But Dr. Galate, a back specialist who had been treating Booth, did not opine that Booth was or would become pain free. Dr. Galate in fact wrote, "No change in medications at this time. The patient is to wean off of medication that we

15

prescribed as tolerated." [Tr. 424.] The ALJ states Booth is able to care for a toddler and takes him outside to play. But the ALJ fails to note Booth had help for a period of time from her brother-in-law; she has locked the child in a room with her on occasion to ensure he is supervised; she avoids taking pain medication so she can stay alert when she is with him; when she takes him outside, she sits and watches him, or uses an electric wheelchair; and when she has a flare-up of symptoms, her husband stays home to help. The ALJ states Booth "walks for exercise daily," [Tr. 23], but that activity consists of going to the back yard and sitting down when the dog needs to go out.

Dr. Box's opinion was well-supported and consistent with the other substantial evidence. The ALJ's decision to give Dr. Box's opinion little weight is not supported by substantial evidence.

The opinion of Dr. Mary McNaughton, the non-examining State-agency doctor, was rendered in June 2012. Dr. McNaughton did not have a treating relationship with Booth, or access to medical records of Booth's doctor visits and treatments for the period following June 2012. The ALJ's decision to give Dr. McNaughton's opinion great weight is not supported by substantial evidence.

Accordingly, the decision is reversed and the case remanded for new hearing and further proceedings consistent with this Order. On remand, the ALJ shall reevaluate the opinion evidence. If Dr. Box's opinion is not given controlling or substantial weight, the ALJ shall explain why not. If Dr. McNaughton's opinion is given more weight than Dr. Box's opinion, the ALJ shall explain why.

### 2. Failure to include chronic fatigue as a severe impairment at Step 2

Booth further argues that the RFC is not supported because the ALJ failed to include

chronic fatigue as a severe impairment at Step 2 of the sequential analysis, and failed to factor that impairment in at Step 5.

The Commissioner does not dispute that chronic fatigue is a severe impairment. The Commissioner argues that chronic fatigue is a component of fibromyalgia, which the ALJ did include as a severe impairment. The Commissioner then argues that the ALJ essentially factored chronic fatigue into the RFC by providing that Booth should never be expected to understand, remember, or carry out detailed instructions, and that her job duties should be simple, repetitive and routine in nature. [Doc. 12, p. 9.]

Chronic fatigue and fibromyalgia are different diagnoses, and more importantly, the limitations provided in the RFC to which the Commissioner points are mental ones. While mental limitations may be appropriate here, they do not address functional limitations caused by Booth's chronic fatigue. The record as a whole shows Booth consistently complained of fatigue that made it difficult to function day-to-day, that she has to nap during the day due to fatigue, that her sleep is disrupted and she has difficulty waking up, and that her sleep issues led to her eight-year-old having to go live with his father because she could not get him to school on time. Furthermore, the VE testified that an individual who misses work two or three days a month, or is an hour late to work once a week, cannot maintain gainful employment.

The ALJ's failure to include chronic fatigue at Step 2 was not harmless error, and the RFC determination is not supported by substantial evidence on the record as a whole. On remand, the ALJ shall consider all of Booth's severe impairments at Step 2 and when evaluating her limitations.

### B. Booth's remaining arguments

Finally, Booth argues reversal is necessary because the VE's testimony conflicts with the

17

Case 4:15-cv-00410-NKL   Document 15   Filed 02/17/16   Page 17 of 18

Dictionary of Occupational Titles, and the ALJ was required, but failed, to acknowledge the conflict and resolve the discrepancies. Specifically, Booth points out that the ALJ posed a hypothetical to the VE with a limitation of no overhead reaching, but all three jobs subsequently cited by the ALJ at Step 5 require frequent reaching, per the DOT. The VE did not explain the conflict with the DOT, nor did the ALJ ask the VE to do so. Furthermore, the ALJ posed a hypothetical to the VE with the limitation that the person "should never be expected to understand, remember, or carry out detailed instructions" [Tr. 58], and the ALJ included that limitation in the RFC. But the cited jobs have a reasoning level of 2 or 3, per the DOT. The VE did not explain the conflict with the DOT, nor did the ALJ ask the VE to do so. The Commissioner argues there is no conflict.

Because the decision is being reversed for the reasons discussed in the preceding sections, and the case remanded for new hearing and further proceedings, the VE's opinion may change. Therefore, the Court will not rule on Booth's arguments concerning conflicts with the DOT at this time. However, on remand the ALJ should consider Booth's arguments.

**III. Conclusion**

The Commissioner's decision is reversed and the case remanded for new hearing and further proceedings consistent with this Order.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:  February 17, 2016  
Jefferson City, Missouri